**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| **1001 WL LLC**, | ) | Case No. 24-10119 |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | |
| | ) | |

**OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT**

TIG Romspen US Master Mortgage LP, an exempted Cayman Islands limited partnership ("Romspen"), as senior secured lienholder against the single real estate asset, a Houston office building (the "Property"), of the estate of debtor and debtor-in-possession, 1001 WL, LLC (the "Debtor"), hereby files this objection (the "Objection") to the *Disclosure Statement Under 11 U.S.C § 1125 for the Debtor's Plan of Reorganization Dated May 6, 2024* [ECF No. 153] (the "Disclosure Statement"), filed in support of the *Debtor's Plan of Reorganization Dated May 6, 2024* [ECF No. 152] (the "Plan") and states as follows:

**ARGUMENT**

**I. DISCLOSURE STATEMENT APPROVAL IS PREMATURE.**

1.  Moving forward with approval of the Disclosure Statement at this time is not in creditors' best interests. After a three-day evidentiary hearing, the Court granted Romspen's motion to lift the stay and has permitted Romspen to conduct a foreclosure of the Property as early as July 2, 2024. [ECF No. 151]. After foreclosure, any plan pursued by the Debtor will be dramatically different than the existing Plan which relies on the Debtor's ongoing ownership of the Property.

1

2. While the Debtor's filing of the Plan and Disclosure Statement met the technical 90-day filing deadline under 11 U.S.C. § 362(d)(3), the Court should not move forward with Disclosure Statement approval and a Plan solicitation process. Rather, the Court (and the parties) should wait until there is certainty regarding an estate to reorganize – which should be ascertained within less than two months. Accordingly, the Court should exercise its discretion to withhold approval of the Disclosure Statement at this time.

## II. THE DISCLOSURE STATEMENT LACKS ADEQUATE, RELIABLE INFORMATION.

3. The Disclosure Statement cannot be approved absent material and extensive amendments.

4. The primary purpose of a disclosure statement is to provide creditors with information necessary to determine whether to accept or reject a debtor's plan. *See In re Cal. Fid., Inc.*, 198 B.R. 567, 571 (9th Cir. B.A.P. 1996); *In re Monnier Bros.,* 755 F.2d 1336, 1342 (8th Cir. 1985). As a result, a disclosure statement must contain "adequate information," defined as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

5. In other words, the disclosure statement must set forth all factors that "bear upon the success or failure of the proposals contained in the plan." *In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986). This information often includes:

- The circumstances that gave rise to the filing of the bankruptcy petition;
- A complete description of available assets and their value;
- The anticipated future of the company;
- The source of information stated in the disclosure statement;
- The present condition of the debtor while in Chapter 11;

- Information regarding claims against the estate;
- A liquidation analysis setting forth the estimated return creditors would receive under Chapter 7;
- The accounting method utilized to produce financial information and the names of the persons responsible for such information;
- The future management of the debtor;
- The Chapter 11 plan or summary thereof;
- The estimated administrative expenses, including attorneys' and accountants' fees;
- The collectability of accounts receivable;
- Financial information, data, valuations, or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
- Information relevant to the risks being taken by the creditors and the interest holders;
- The actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
- Litigation likely to arise in a non-bankruptcy context; and
- The relationship of the debtor with any affiliates.

*In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Jeppson*, 66 B.R. at 292.

### Lack of Adequate Pre-Bankruptcy Information.

6. As noted above, courts require debtors to fully disclose the circumstances that led to their bankruptcy filing and to provide a complete description of available assets and their value. Here, the Disclosure Statement lacks adequate information regarding significant pre-petition events that gave rise to the bankruptcy filing as well as incomplete information regarding the Debtor's sole asset, the Property.

7. First, the Disclosure Statement's description of the September 3, 2019, trustee sale contains a number of allegations that the Debtor presents as statements of fact, including that the foreclosure sale was defective. *See* Disclosure Statement, at 8, II.B.2. To provide creditors with adequate information necessary to understand the Debtor's years-long, pre-petition absence from the Property and the circumstances that gave rise to the bankruptcy, the Debtor should indicate

that this is its characterization or allegation regarding the facts surrounding the trustee sale, and that a pending adversary proceeding will resolve these allegations.

8. Next, the Disclosure Statement states that the Debtor obtained the Property through a transfer from Galleria Loop Note Holder, LLC ("GLNH"). *See id.* However, the Disclosure Statement fails to disclose that GLNH is wholly owned and controlled by Ali Choudhri ("Choudhri"), the 100% member and controlling person over the Debtor. As presented, it appears as though GLNH was controlled by Lender from its formation in May 2019, and that the Property transfer via Special Warranty Deed in January 2024 was Lender-directed. The Disclosure Statement's prepetition timeline must include Choudhri's exercise of the option to acquire 100% of the membership interests in GLNH in September 2019, and his ongoing control of GLNH from that point forward.

9. The Disclosure Statement's brief mention of the Property transfer from GLNH to the Debtor fails to explain what consideration, if any, the Debtor paid in exchange for the transfer; and the source of that consideration.

10. The Disclosure Statement fails to identify what, if any, business activities the Debtor engaged in from the September 3, 2019, foreclosure sale until the transfer of the Property by GLNH to the Debtor in January 2024.

11. Additional background information missing from the Disclosure Statement includes Romspen's numerous attempts to foreclose the Property. The Disclosure Statement only references that the Property was posted for foreclosure on February 5, 2024. *See id.*, at 7, II.B.2. Not only is this factually inaccurate (the scheduled foreclosure sale date was February 6, 2024), the Disclosure Statement must include that the Romspen indebtedness had been in default since at least maturity in May 2020; acknowledge Romspen's several attempts to accommodate GLNH's

failed attempts to perform; and inform of Romspen's several prior attempts to foreclose on the Property – and GLNH's evasive measures – for a full and complete disclosure regarding the events that led to the bankruptcy filing. This background is especially relevant to the Debtor's assertion of its ability to perform on a go-forward basis.

12. The Disclosure Statement fails to provide information about the historical occupancy rate of the Property or information regarding the lease periods for the Debtor's existing tenants – which is imperative to evaluating the asserted projected revenue derived from the Property.

13. Similarly, the Disclosure Statement should contain more information about the deed of trust the Debtor granted in favor of the Debtor's member and manager, Choudhri, in the few days immediately prior to the bankruptcy filing. The deed of trust itself lacks information regarding the nature and amount of the debt allegedly secured by the Property and other terms of the underlying transaction.

### Lack of Adequate and Critical Information Regarding Claims.

14. The Disclosure Statement misleads creditors by simply stating that the Debtor filed its Schedules of Assets and Liabilities ("Schedules") and Statement of Financial Affairs ("SOFA"). *See id.* at 8, II.C. At the Debtor's 341 meeting on March 6, 2024, and during testimony at deposition and in Court, Choudhri acknowledged that the Schedules and SOFA contained errors that needed corrections. To date, the Debtor has yet to file corrected Schedules or SOFA. Without identifying that the Schedules and SOFA are incorrect and, thus, unreliable; and without the benefit of corrected Schedules and SOFA, the Disclosure Statement misleads creditors by directing them to inaccurate information.

**Inadequate and Inconsistent Information Regarding Claims Involving the Debtor's Insiders and Affiliates.**

15.     The Disclosure Statement and the Plan contain inconsistent definitions of the term "affiliate." The Disclosure Statement inaccurately refers to the Bankruptcy Code's definition of the term without referencing where the actual definition can be found, and only provides a summary of the Bankruptcy Code definition. *See id*. at 17, VII. In contrast, the Plan defines the term more broadly than stated in the Disclosure Statement, and expands what is stated in the Disclosure Statement by adding "its past and present parents, subsidiaries and affiliates, and their respective past and present officers, directors, shareholders, partners, agents, employees, attorneys, and legal representatives, and their respective predecessors, heirs, executors, and administrators, and their permitted successors and assigns." Plan at 2, 1.01.05. The Disclosure Statement does not address whether the Debtor has any affiliates under the definition contained in the Plan.

16.     In addition to the misleading and inconsistent definitions of "affiliate," the Disclosure Statement lacks any information about the Debtor's insiders. Failing to explain "fully, completely and in detail all transactions with insiders" is a fatal flaw of a disclosure statement. *In re Malek*, 35 B.R. 443, 444 (Bankr. E.D. Mich. 1983); *accord In re First Magnus Fin. Corp.*, Case No. 4:07-BK-01578-JMM, 2007 WL 4531678, at *1 (Bankr. D. Ariz. Dec. 14, 2007) (". . . insider[s] need to be specified in the body of the disclosure statement."). An insider includes a director, officer, the person in control, affiliate, or managing agent of the debtor; or an insider of an affiliate of the debtor. *See* 11 U.S.C. § 101(31) (B), (E), (F). To provide creditors with adequate information, the Debtor must list and include all parties and entities that meet the definition of insider.

17.     Finally, the Disclosure Statement does not contain adequate information regarding potential claims involving insiders. Specifically, it fails to describe whether the Debtor conducted

any investigation or evaluation of insider transactions to ascertain whether, for example, there are avoidance actions available to the estate; and if there has been some evaluation or investigation, the Disclosure Statement fails to describe the extent and results thereof. The Disclosure Statement also does not explain whether the Plan contains a deadline to pursue any such claims. This is all information that should be in the Disclosure Statement to enable creditors to make informed decisions about whether to reject or accept the Plan.

### Lack of Adequate Information Regarding the Proposed Plan.

18. The Disclosure Statement's description of the Plan is riddled with unsupported assumptions, numerus inconsistencies that could mislead creditors, and a general lack of essential information.

19. First, the Disclosure Statement lacks adequate information regarding the proposed process of converting the Property into medical and office condo units, such as, for example: the length of time it will take to convert the Property, whether the city or any other governmental authorities will be involved, the total cost to the estate of this proposed course of action, who will pay such costs (and from what sources), and the management and maintenance of the Property's common areas post-conversion. The Disclosure Statement does not identify any other properties that have undergone a similar type of conversion as context for whether the Debtor's strategy is viable.

20. Second, the Disclosure Statement and the Plan contain conflicting timelines for the critical date of the Debtor's targeted closing of the sale of the units. The Debtor will not close any sales until and unless it obtains an aggregate of $50 million in condominium sales reservations. *See* Disclosure Statement at 10, II.D.1(iv). The Debtor refers to this date as the "Condominium Sale Date." *Id.* The Disclosure Statement states that the Condominium Sale Date will not occur

"later than eighteen (18) months after the Effective Date" (*id*.), but the Plan states that the Condominium Sale Date will not occur not later than "nine (9) months after the Effective Date." Plan at 3, 1.01.20 and 8.01(iv).

21. The Disclosure Statement also fails to provide any rationale why $50 million in sales reservations is the appropriate threshold, and does not address what will occur if the Debtor fails to secure adequate reservations within the designated timeframe.

22. The Disclosure Statement explains that interested parties who enter reservation agreements must pay a reservation fee of 1% of the agreed unit purchase price, but fails to disclose whether this fee is refundable (and if so, how the collected fees will be preserved if refunds become necessary) or whether it is to be applied against the unit purchase price (or any restrictions on the use of the funds). *See* Disclosure Statement at 10, II.D.1.(iii).

23. The Debtor relies on an assumption that potential purchasers can obtain Small Business Administration ("SBA") loans and describes purported terms of such loans. *See id.*, at 9, III.D.1. However, the Disclosure Statement does not identify the source of this information – i.e., whether this is the Debtor's belief, or based on information from the SBA, or some other source. The Disclosure Statement also fails to address: (1) whether SBA loans require personal guarantees, (2) whether there are any fees associated with SBA loan products, (3) whether SBA loans have property type or use restrictions, (4) whether there are limits on SBA loan concentration within a single building, and (5) whether there are other SBA loan application requirements. At the very least, the Disclosure Statement should direct readers to resources for answers to these and other important questions on SBA loans, or inform readers that they should seek professional advice on this topic.

24. The Disclosure Statement states that the Debtor will generate $94-$117 million by selling individual units in the Property, based on a unit price of $400-$500 per square foot. *See* Disclosure Statement at 9, D.1. However, the Disclosure Statement offers no explanation how or by whom such sale price was determined, or any other basis for the figure; and does not say whether the sale proceeds is a gross or a net amount (after payment of typical closing costs, fees, taxes, etc.).

**Lack of Adequate Information Regarding the Claims in the Proposed Plan.**

25. The Disclosure Statement cannot be approved given the following additional defects:

  i. <u>Class 1.</u> Lacks information regarding source of payment.
  ii. <u>Class 2</u>. Lacks information regarding source of payment and how post-petition taxes are treated.
  iii. <u>Class 3</u>. Lacks information regarding alleged amount of GLNH claim.
  iv. <u>Class 3(e)</u>. Lacks information regarding source of monthly interest payments after purported application of the $1.4 million easement payment (which itself is an impermissible application of collateral sale proceeds), whether monthly interest payments are made in arrears or in advance, and what day monthly interest payments are due.
  v. <u>Class 7.</u> Lacks disclosure that unsecured claim payments will not include any interest per Section 2.04 of the Plan.
  vi. <u>Class 8.</u> Lacks information regarding the value, if any, contributed by equity.
  vii. <u>Section V.D. of the Disclosure Statement</u>. Fails to define what comprises a default by the Debtor and a hypothetical creditor.
  viii. <u>Section V.E of the Disclosure Statement</u>. In its discussion of claims "of any party relating to contribution or indemnity against the Debtor which is contingent as of the Effective Date," there is no clear explanation of the timing for asserting such claims.
  ix. <u>Section V.F of the Disclosure Statement</u>. Lacks information regarding rejection damage claim and assumption cure claim calculations and treatment, and what will be the source of payment.

**Lack of Adequate Information Regarding the Debtor's Financial Information.**

26. The Disclosure Statement does not provide adequate information to evaluate whether the financial information provided by the Debtor is reliable, and has indications that the financial information is unreliable.

27. The Debtor included as Exhibit B a 2023 income statement, but failed to disclose the person responsible for preparing the 2023 income statement or the accounting method used to prepare the income statement. In addition, the income statement is incomplete and misleading because it does not reflect any debt service payment obligations, full tax obligations, or unpaid operating expenses for 2023.

28. As support for the Disclosure Statement, the Debtor attached a projection of its estimated income and expenses for 2024 at Exhibit C. Similar to the Debtor's 2023 income statement, however, the Disclosure Statement does not include information regarding who prepared the projections and the accounting method used. Further, these projections do not cover a sufficient length of time: projections should span the period of Plan performance (here, unsecured creditor payments are due ninety (90) days after the Condominium Sale Date, plus an additional twenty-eight (28) days for providing notice of the Debtor's failure to pay), which will extend well beyond 2024 even under a nine-month sales window; the eighteen-month sales window requires even lengthier projections.

29. As support for the proposition that its proposed Plan is feasible, the Disclosure Statement incudes as Exhibit A an exhibit purporting to illustrate how an existing tenant would fare under a purchase rather than its existing lease. However, this illustration is riddled with inconsistencies.

30.    First, the Disclosure Statement describes the exhibit as reflecting a purchase price of $6,341,000 (Disclosure Statement at 9, II.D.1) whereas Exhibit A shows a purchase price of $1,389,000. In addition, Exhibit A contains a 5% interest rate while the Disclosure Statement refers to a 9.5% interest rate (Disclosure Statement at 9, II.D.1).

31.    Another inconsistency is that the Disclosure Statement states that the tenant's total rental obligation would be $2.4 million (Disclosure Statement at 9, II.D.1) whereas Exhibit A shows total rental obligations of $1.3 million. The Disclosure Statement also does not specify whether this $2.4 million incorporates the "tax shield" that is included in the analysis in Exhibit A; nor is there a clear explanation of the "tax shield" concept. At the very least, Exhibit A should clearly reflect that it is hypothetical and illustrative only, and refer users to seek advice from legal, tax and other qualified professionals.

32.    The Disclosure Statement further fails to provide a basis for the Exhibit A figures used to support the Debtor's position that a unit purchase is favorable over a unit lease. For instance, the Disclosure Statement does not provide any information regarding the amounts the Debtor uses for square footage, nor does the Disclosure Statement contain any information about who created the illustrative table. The Debtor does not provide any information about the accounting method used; indeed, the inclusion of "depreciation" suggests an improper blend of cash and accrual-based accounting, and there is no adjustment for time value of money. These disclosure flaws are likely to create confusion and mislead creditors.

33.    The Debtor offers Exhibit C to illustrate its projections of future performance, but fails to account for Effective Date payments; indeed, there is no disclosure estimating Effective Date payments or the anticipated administrative claim amount. Additionally, Exhibit C includes payments to Norris and Associates although neither the Disclosure Statement nor the Plan discuss

Norris and Associates, and the Debtor has withdrawn its application to employ Norris and Associates. [ECF 139]. Further, the projections mislead by asserting, without support and contrary to a filed objection, that occupant Xavier Educational Academy ("Xavier") will begin paying $74,841.67 for the third floor based on an undisclosed email. Xavier has disputed the claim that it will begin payments. [ECF No. 88]. Finally, the projected rental income is misleading as it does not match the income the Debtor provided in a chart in Section III.B or the income reported in the filed monthly operating reports. *See* ECF No.135 (February rent collections of $89,299), 136 (March rent collections of $135,963).

34. Finally, the Debtor attaches Exhibit D to demonstrate claims of unsecured creditors. However, there are columns without headings that render the chart unclear (there are items marked "YES" and there are reduced claims amounts without explanation). The Debtor also does not explain why BDFI is excluded. *See* Disclosure Statement at 13, Class 2.

**Lack of Adequate Information Regarding the Debtor's Future Management.**

35. A Disclosure Statement must include full and complete information regarding a Debtor's future management, which includes compensation for any of a debtor's insiders, directors, and/or officers. *In re Cardinal Congregate I*, 121 B.R. at 765.

36. Here, the Disclosure Statement explains that Choudhri, the Debtor's member, will be the initial manager and will appoint future managers. *See* Disclosure Statement at 10, II.D.2. However, there is no indication whether, and if so how much, compensation will be paid to the manager(s). The Disclosure Statement identifies that Angelo DeCaro will supervise the Debtor's financial and restructuring affairs, but fails to provide whether the Debtor will continue the use of its current management company, insider and unsecured creditor Jetall Companies, Inc. ("Jetall")

or the payments anticipated to be made to either Mr. DeCaro or Jetall (or the source of such payment).

### Inadequate Liquidation Analysis.

37. A confirmable plan must satisfy the "best interest" test, a shorthand for the requirement that the plan provide each non-consenting holder of an impaired class of claim or interest with "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A). A liquidation analysis is a critical tool to provide creditors sufficient information to determine whether the best interest test is satisfied.

38. The Disclosure Statement contains no liquidation "analysis." Instead, the Disclosure Statement simply states that if the case was converted to chapter 7, Romspen would be allowed to foreclosure and creditors would lose the upside associated with the proposed condominium conversion. First, the Court's ruling modifying the automatic stay to permit Romspen to foreclose on the Property moots the liquidation analysis as presented. Second, the Debtor's analysis fails to account for all estate property: for example, it does not address the various lawsuits involving the Debtor and other entities that the Debtor values in tens of millions of dollars. *See*, e.g., Disclosure Statement at 11, IV.B. The Disclosure Statement must explain precisely how creditors' claims will fare in a liquidation, describing the anticipated liquidation value of all estate property and the anticipated recovery for creditors in the event of liquidation, and compare that scenario against realistic recovery expectations under the Plan.

## III. ADDITIONAL DISCLOSURE STATEMENT INCONSISTENCIES AND MISTAKES.

39. The Disclosure Statement initially states that the Debtor is a New York limited liability company, but later states that the Debtor is a Texas limited liability company. *Compare* Disclosure Statement at 1, I.A *with* 7, II.A.

40. The Disclosure Statement refers to a prospective easement agreement with "AJO Operating, LLC." Disclosure at 10, II.D.1. In contrast the Plan refers to the entity as both "AJO Operating, LLC" (Plan at 11, 4.03(e)(ii)) and "AIO Operating, LLC" (Plan at 16, 8.01 (a)). This is unclear and confusing information that must be reconciled.

41. The Disclosure Statement has additional defects:

   i. Page 7, II.B.2., refers to Romspen as "Defendant TIG Romspen US Master Mortgage LP." The term "Defendant" must be removed.

   ii. Page 7, II.B.2., states that 1001 WL, LLC acquired the Property on January 26, 2017, at which time the Property was subject to certain liens. Among the liens listed is (a) a Deed of Trust in favor of Kolee 59 Trust, recorded on February 8, 2017; and (b) a Deed of Trust in favor of George M. Lee recorded in February 8, 2017. These deeds of trust were recorded after the Debtor acquired the Property, and thus the Property was not subject to those liens at the time of the Debtor's acquisition.

   iii. Page 8, II.B.2., incorrectly states, "On or about September 5, 2019, Galleria Loop Note Holder, LLC executed a deed of trust and assignment of rents to TIG Romspen US Mater Mortgage, LP" The correct execution date was May 30, 2019; the agreements were recorded on September 5, 2019.

   iv. Page 8, II.B.2., incorrectly states that the Property was posted for foreclosure on February 5, 2024. Among other dates, the Property was posted for a foreclosure sale to occur on February 6, 2024.

   v. Page 8, II.C, incorrectly states that the Debtor filed its petition on February 5, 2024. The correct petition date is February 6, 2024.

   vi. Page 19, IX.C., states the Debtor claims that Xavier has not paid rent <u>to the Debtor</u> since March 2022. There is no basis for asserting Xavier had any obligation to pay the Debtor; the Property had been owned by, and any lease agreement with Xavier was with, GLNH and not the Debtor.

      vii. The Disclosure Statement does not state that capitalized terms not defined in the Disclosure Statement have meaning given in the Plan.

42. The Plan also has faulty information. Section 5.01.01 refers to a list of lease and contracts to be assumed, but the table appears to be incomplete; and Section 5.07 refers to "Class 14" of claims and "Section 4.14" of the Plan, neither of which exist in the Plan.

## IV. THE PLAN IS NOT CONFIRMABLE.

43. A plan can only be confirmed if confirmation "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan." 11 U.S.C. § 1129(a)(11). The purpose of this requirement is to prevent confirmation of "visionary schemes." *In re Draimian*, 450 B.R. 777, 812 (Bankr. N.D. Ill. 2011) (quoting *Travelers Ins. Co. v. Pikes Peak Water Co.* (*In re Pikes Peak Water Co.*), 779 F.2d 1456, 1460 (10th Cir. 1985)); *In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1984).

44. A plan must also provide a realistic and workable framework for reorganization. *In re Art & Architecture Books of the 21st Century*, 2016 Bankr. LEXIS 859, at *56 (Bankr. C.D. Cal. 2016); *In re Quigley*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (citing *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988)); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (holding that a plan must be "reasonably likely [to] succeed [] on its own terms without a need for further reorganization on the debtor's part to be feasible"). It must also be "firmly rooted in predictions based on objective fact," and all projections must be based on concrete evidence of financial progress and must not be speculative, conjectural, or unrealistic. *In re Sound Radio, Inc.*, 93 B.R. 849, 855 (Bankr. D.N.J. 1988) (citations omitted); *see also Repurchase Corp. v. Bodenstein* (*In re Repurchase Corp.*), 2008 U.S. Dist. LEXIS 23504, at *13-14 (N.D. Ill. 2008) ("section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan.")

(citations omitted); *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 508 (S.D.N.Y. 1994) ("To establish feasibility, [a] debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations."); *In re Radco Props., Inc.*, 402 B.R. 666, 678-80 (Bankr. E.D.N.C. 2009) (rejecting debtor's feasibility analysis for being "speculative" and not based on "objective fact").

45. As demonstrated above, the financial information and projections provided in support of the Disclosure Statement lack appropriate basis and are not reasonable. A conversion from a leased office building to medical and office condominiums is a novel concept without any indication it has succeeded in other cases, and the Debtor expects to achieve it within a matter of months to generate approximately five times the appraised value of the building. This is precisely the kind of speculative, "visionary scheme" that cannot be confirmed, as it will likely be followed by a need for further reorganization.

## RESERVATION OF RIGHTS

46. Romspen reserves the right to supplement this Objection in the event that the Debtor submits an amended disclosure statement for the Court's consideration. Further, nothing in this Objection shall be construed to limit any objections that Romspen may raise in connection with confirmation of the Debtor's Plan. Romspen reserves all rights to assert any of the objections contain herein, as well as any additional objections, in connection with confirmation of the Plan.

///

///

///

WHEREFORE, Romspen respectfully requests that the Court (a) withhold any approval of the Disclosure Statement until after Romspen has foreclosed its interests in the Property; (b) sustain these objections and decline to approve the Disclosure Statement; and (c) grant such other relief as this Court deems appropriate.

DATED this 17th day of May, 2024.

**BRYAN CAVE LEIGHTON PAISNER LLP**

*/s/ Kyle S. Hirsch*
Kyle S. Hirsch (Tex. Bar No. 24117262)
2200 Ross Avenue, 4200W
Dallas, Texas 75201
Telephone: 602.364.7170
Email: kyle.hirsch@bclplaw.com

Brigid K. Ndege (*Pro Hac Vice*)
161 North Clark Street, Suite 4300
Chicago, Illinois 60601-3315
Telephone: 312.602.5104
Email: brigid.ndege@bclplaw.com

***Attorneys for TIG Romspen US Master Mortgage LP***

**CERTIFICATE OF SERVICE**

    I hereby certify that on May 17, 2024, a true and correct copy of this document was served to any attorney who has appeared of record, through the Court's ECF notification system as follows:

- Beau Butler on behalf of Interested Party Xavier Educational Academy, LLC bbutler@jw.com, kgradney@jw.com;steso@jw.com

- Mark Junell on behalf of Creditor BDFI, LLC mark@junellfirm.com

- John C. Roy on behalf of U.S. Trustee United States Trustee - AU12 casey.roy@usdoj.gov, gary.wright3@usdoj.gov

- Stephen W. Sather on behalf of Debtor 1001 WL, LLC ssather@bn-lawyers.com, phammer@bnlawyers.com;cmurnane@bn-lawyers.com;plevine@bnlawyers.com; cchristensen@bnlawyers.com;BarronNewburgerPCAustin@jubileebk.net;mcalderon@bnlawyers.com;kparsley@bn-lawyers.com

- Stephen W. Sather on behalf of Plaintiff 1001 WL, LLC ssather@bn-lawyers.com, phammer@bnlawyers.com;cmurnane@bn-lawyers.com;plevine@bn-lawyers.com;cchristensen@bnlawyers.com;BarronNewburgerPCAustin@jubileebk.net;mcalderon@bnlawyers.com;kparsley@bn-lawyers.com

- Mark Curtis Taylor on behalf of Attorney Holland & Knight LLP mark.taylor@hklaw.com, tammy.greenblum@hklaw.com;annmarie.jezisek@hklaw.com

- Shane P. Tobin on behalf of U.S. Trustee United States Trustee - AU12 shane.p.tobin@usdoj.gov, Carolyn.Feinstein@usdoj.gov;gary.wright3@usdoj.gov

- United States Trustee - AU12 ustpregion07.au.ecf@usdoj.gov

- Broocks Wilson on behalf of Creditor Sonder USA Inc. mack.wilson@keanmiller.com

                                                  */s/ Kyle S. Hirsch*
                                                  Kyle S. Hirsch