UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION


| | | |
|---|---|---|
| IN RE: | ) | CASE NO: 24-10119-smr |
| | ) | CHAPTER  11 |
| | ) | |
| 1001 WL, LLC, | ) | Austin, Texas |
| | ) | |
| | ) | Thursday, August 22, 2024 |
| Debtor. | ) | |
| | ) | 4:26 p.m. to 5:18 p.m. |


** PARTIAL TRANSCRIPT **

TESTIMONY OF ERIC RODRIGUEZ


BEFORE THE HONORABLE SHAD ROBINSON,
UNITED STATES BANKRUPTCY JUDGE



APPEARANCES:              See page 2


Courtroom Deputy:         Blayne Turner


Court Reporter [ECRO]:    Recorded; Ren Schoener


Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:

| | |
|---|---|
| For Debtor: | STEPHEN W. SATHER, ESQ.<br>Barron & Newburger<br>7320 N. MoPac Expy., Suite 400<br>Austin, TX 78731<br>512-476-9103 Ext. 220 |
| | MARK C. TAYLOR, ESQ.<br>Holland & Knight<br>100 Congress Ave., Suite 1800<br>Austin, TX 78701<br>512-685-6400 |
| For Galleria Loop<br>Note Holder: | SHEA N. PALAVAN, ESQ.<br>Houstonip<br>5353 West Alabama St<br>Suite 303<br>Houston, TX 77056<br>832-800-4133 |
| For Ali Choudhri: | ALI CHOUDHRI, PRO SE |
| For TIG Romspen: | KYLE HIRSCH, ESQ.<br>BRIGID K. NDEGE, ESQ.<br>Bryan Cave Leighton Paisner<br>Two North Central Avenue<br>Suite 2100<br>Phoenix, AZ 85004<br>602-364-7170 |
| For Sonder USA: | BROOCKS WILSON, ESQ.<br>Kean Miller<br>711 Louisiana St.<br>Suite 1800<br>Houston, TX 77002<br>713-844-3063 |
| For Xavier Academy: | MAYA GHYAS, ESQ.<br>GENEVIEVE M. GRAHAM, ESQ.<br>JAVIER GONZALEZ, JR., ESQ.<br>LUKE GILMAN, ESQ.<br>Jackson Walker<br>1401 McKinney St.<br>Suite 1900<br>Houston, TX 77010<br>713-752-4231 |
| Also present: | RICHARD DE LA CUADRA |

3

<u>INDEX</u>

| ROMSPEN'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ERIC RODRIGUEZ | 4/5 | 30 | 42 | 44 |

| ROMSPEN'S EXHIBITS | | | | RECEIVED |
|---|---|---|---|---|
| 30 | | | | 9 |
| 31 | | | | 7 |

| DEBTOR'S EXHIBIT | | | | RECEIVED |
|---|---|---|---|---|
| 32 | | | | 20 |

Rodriguez - Direct / By Ms. Ndege                          4

1        **Austin, Texas; Thursday, August 22, 2024; 4:26:02 p.m.**

2           **(Partial transcript; Testimony of Eric Rodriguez**

3           **THE COURT:** -- can swear you in.

4           **THE CLERK:** Please raise your right hand.

5              **ERIC RODRIGUEZ, ROMSPEN'S WITNESS, SWORN**

6           **THE CLERK:** Thank you. If you'll have a seat in the

7    witness stand.  And watch your step right over here.

8           **THE COURT:** All right.  Oh, sorry.

9                        **DIRECT EXAMINATION**

10   **BY MS. NDEGE:**

11   Q    Good afternoon, sir -- sorry.

12          **THE COURT:** Hold on, hold on, Ms. Ndege.

13          **THE CLERK:** Please state your full name and spell

14   your last name for the record.

15          **THE WITNESS:** Full name is Eric Cain (phonetic)

16   Rodriguez, R-o-d-r-i-g-u-e-z.

17          **THE COURT:** All right.  Just for purposes of the

18   record, this is a witness being called by Romspen out of order,

19   Mr. Rodriguez.

20          Therefore, Ms. Ndege, this is your witness.  So it

21   will be a direct examination.  It's not a cross, just for a

22   reminder.  And then, of course, Debtor will have a change to

23   cross.  All right.  You may proceed.

24          **MS. NDEGE:** All right.

25   //

1       **DIRECT EXAMINATION (RESUMED)**

2   **BY MS. NDEGE:**

3   Q    Good afternoon, Mr. Rodriguez.

4   A    Good afternoon.

5   Q    What is your educational background?

6   A    I have a Bachelor of Science in Civil Engineering from

7   New Mexico State University and I have an MBA in Corporate

8   Finance from the University of Texas at Austin.

9   Q    And what certifications or professional licenses do you

10  have?

11  A    I'm a licensed professional engineer.

12  Q    How long have you been a licensed professional engineer?

13  A    Since 2004.

14  Q    Were you hired to inspect 1001 West Loop South in Houston,

15  Texas to assess it for repair and maintenance fees?

16  A    I was, yes.

17  Q    All right.  I'm going to refer to the subject site of the

18  property.  Did you inspect the property?

19  A    I did, yes.

20  Q    When did you inspect the property?

21  A    I believe the date was July 12th.

22  Q    And you're aware that there was a hurricane, Hurricane

23  Beryl, that came through days before your inspection, right?

24  A    I am aware, yes.

25  Q    How did you factor that into your inspection?

Rodriguez - Direct / By Ms. Ndege                    6

1   A    The issues I was looking for were issues that I felt would

2   have been present at the property prior to the hurricane

3   occurring.

4   Q    Can you describe the property?

5   A    It's a Class B office building.  It's about eight -- I

6   believe it's eight stories and then an eight-story parking

7   garage structure as well.

8   Q    And can you generally describe the area and the parts of

9   the property that you inspected?

10  A    So I was given access to the roof.  I inspected the roof.

11  I was able to walk the eighth floor of the office building.  I

12  walked the first floor of the office building which included

13  some mechanical rooms.  I also went inside the mechanical

14  penthouse and then I looked at the entire parking structure.

15  Q    I'm going to show you a series of pictures.  Do you know

16  who took these pictures?

17  A    Those pictures were taken by me.

18  Q    All right.  Are these pictures true and accurate

19  depictions of the condition of the property on the day that you

20  inspected the property?

21  A    They are.

22  Q    Are these annotations -- are these your annotations in the

23  pictures?

24  A    They are.

25  Q    Why did you add these?

Rodriguez - Direct / By Ms. Ndege                    7

1   A    It provides some context and then some explanation as to

2   what was being shown in the photographs.

3          MS. NDEGE:  Your Honor, I move to admit Exhibit 31

4   into evidence.

5          THE COURT:  So all of those pictures are all Exhibit

6   31?

7          MS. NDEGE:  Yes, Your Honor.

8          THE COURT:  All right.  Any objections to Exhibit 31?

9          MR. TAYLOR:  No objection, Your Honor.

10          THE COURT:  Romspen's Exhibit 31 is admitted.

11          **(Romspen's Exhibit Number 31 is received in evidence)**

12   **BY MS. NDEGE:**

13   Q    Did you prepare a report regarding the condition of the

14   property after your inspection?

15   A    I did.

16   Q    Do you have a copy of that report?

17   A    I do.

18   Q    All right.  Does that report include a list of repairs

19   that you believe the property needs?

20   A    It does, yes.

21   Q    All right.  I'd like to walk through this list with you.

22   So the first item is the roof and we're just going to pull up

23   the picture.  Can you please describe what you observed on the

24   roof?

25   A    Yes.  So the roof -- it's a built-up roof.  It's -- the

Rodriguez - Direct / By Ms. Ndege                    8

1   primary concern I had here is you see all of the standing

2   water.  That's what we call "ponding" where the water holds

3   stare.  It's problematic because it damages the roofing

4   material.  It creates opportunity for leaks.  It adds a

5   significant amount of load to the structure which it's

6   typically not designed for.  The roof is supposed to shed and

7   drain water.

8   Q    Given those observations, what recommendations do you have

9   regarding the roof?

10  A    So based on what I saw and also based on the age of the

11  roof, these types of roof have an average life expectancy of 15

12  to 20 years.  From the data I was able to gather, it's my

13  understanding that this roof is probably at least 25 years old.

14  So considering the age of the roof, the fact that it's -- if it

15  is, indeed, that old, it's exceeded its useful life and then

16  it's excessive ponding.  My recommendation is that a new roof,

17  just that the roof be replaced entirely.

18  Q    Did the hurricane we discussed previously have any impact

19  -- any bearing on what you observed?

20  A    No.  Really the only thing in this picture that you'll see

21  that's hurricane-related is I point out the cable tray.  That's

22  just a track where electrical conduit runs.

23  Q    Okay.

24  A    And you can see it's lifted and twisted.  That, I've got

25  to imagine, is most likely due to the hurricane that occurred

Rodriguez - Direct / By Ms. Ndege                    9

1  before but the ponding, that's going to occur with any kind of

2  rain event, whether it's a hurricane or not.

3  Q    And did the hurricane have any bearing on your opinion

4  about the necessary repairs for the roof?

5  A    No, it did not.

6  Q    Did you calculate an estimate of the repairs that you

7  recommended?

8  A    I did.

9  Q    Did you record this estimate in a table or a document?

10 A    Yes, it's contained in my report.

11 Q    All right.  Did you include it as Exhibit 4 of your

12 report?

13 A    I did, yes.

14 Q    Okay.  So I'm going to -- I'm showing you on the screen

15 Exhibit 30.  Is this a copy of that repair estimate we just

16 discussed?

17 A    It is, yes.

18       **MS. NDEGE:**  Your Honor, I'm going to move to admit

19 the repair estimate into evidence.

20       **THE COURT:**  Any objections to Romspen's Exhibit 30?

21       **MR. TAYLOR:**  No objection.

22 **BY MS. NDEGE:**

23 Q    Where in the estimate --

24       **THE COURT:**  Hold on.  Exhibit 30 is admitted.

25       **(Romspen's Exhibit Number 30 is received in evidence)**

1        **MS. NDEGE:**  Sorry, Your Honor.

2    **BY MS. NDEGE:**

3    Q    Where in the estimate is the roof repair cost?

4    A    It's the very first section.

5    Q    And what is the number you estimated?

6    A    It's $266,322.94.

7    Q    How did you derive that amount?

8    A    So we used -- we estimated the amount to -- we estimated

9    to cost to repair using a publication called "RSMeans."

10   Q    All right.

11   A    It's a publication that publishes national averages for

12   construction costs for commercial buildings.  And we used the

13   renovation one.  We used the data for Houston in the current

14   quarter.  And that's a -- it's a tool that's used in the

15   engineering industry as well as the forensic engineering

16   industry.

17   Q    And it's used to do what exactly, if you can elaborate?

18   A    It's used to estimate construction costs.  So what happens

19   lots of times in my line of work, when I am investigating

20   potential construction costs, it's not always possible to go

21   out and get a quote from a contractor.  It's very difficult for

22   me to call a contractor and ask him to expend resources to come

23   out and give me a quote on the project because I have no

24   authority to give him the work.  And so he's probably never

25   going to see that work.  So he doesn't want to provide that for

Rodriguez - Direct / By Ms. Ndege                    11

1  me for free.

2          The other thing, once they learn it's in litigation,

3  they get nervous and they get spooked.  And they apply,

4  typically in my experience, a very large multiplier on top of

5  that to account for any kind of issues for the risk that

6  they're taking on.

7          So what we typically do is we use this publication,

8  RSMeans, and when I'm dealing with the closing experts, that's

9  usually what I see our estimates from RSMeans.

10 Q    Is RSMeans widely used?

11 A    Yes, absolutely.

12 Q    So the next item on your list is a floor drop ceiling and

13 a mechanical penthouse.  I'm going to show you two pictures.

14 Could you please describe your observations of the drop ceiling

15 and the mechanical penthouse?

16 A    So -- yes.  So this photograph right here, I believe, is

17 the photograph of the drop ceiling actually on the eighth floor

18 and then there's other photographs of the drop ceiling in the

19 mechanical penthouse.  But as I alluded to earlier --

20         **THE COURT:**  Let me interrupt.  Let me make sure I'm

21 -- is it mechanical penthouse?

22         **THE WITNESS:**  Yes, sir.

23         **THE COURT:**  Okay.  I just wanted to make sure I'm

24 hearing it correctly.  All right.  Sorry for the interruption.

25         **THE WITNESS:**  So the photograph on the screen right

1    now is from the inside of the mechanical penthouse.  It's just

2    a penthouse that's up at the roof level that houses the

3    mechanical equipment.

4    **BY MS. NDEGE:**

5    Q    What recommendations did you have regarding the mechanical

6    penthouse and the drop ceiling?

7    A    So I felt that the drop ceiling -- the tiles needed to be

8    replaced.  Because of the leaks that were happening in the

9    roof, the tiles were becoming water damaged.

10   Q    Did you feel that specific -- did you come to the

11   conclusion that specific tiles needed to be replaced or all the

12   tiles needed to be replaced?

13   A    So in the mechanical penthouse, the damage to the tiles

14   was much more significant than inside the building.  They were

15   all soft and wet to the touch.  They were bowed.  They were

16   stained.  In the -- on the eighth floor of the office building,

17   there are many that are stained and water damaged and wet, not

18   100 percent of them.

19   Q    Okay.

20   A    But my recommendation was to replace them all because if

21   you replace spot ones, they'll bring them in.  They won't match

22   in color and the additional cost to replace the ones that maybe

23   haven't been damaged is minimal at that point if you're already

24   doing a widespread replacement.

25   Q    So did the hurricane have any bearing on what you observed

Rodriguez - Direct / By Ms. Ndege                    13

1   when it came to the drop ceiling and the mechanical penthouse?

2   A    No, because the staining that I would have seen would have

3   happened before and if anything, it was just able to show me

4   kind of where some of the active leaks were actually.

5   Q    And did it have any bearing on the recommendations of

6   necessary repairs that you made?

7   A    It did not, no.

8   Q    Did you calculate an estimate for the drop ceiling in the

9   mechanical penthouse?

10  A    I did.

11  Q    What's the number that you estimated?

12  A    So, yeah, if you scroll down there, the number for that is

13  $153,750.

14  Q    And how did you derive this amount?

15  A    That was the same way.  We estimated the cost of work

16  using the RSMeans data.

17  Q    The next item on your list was the mechanical ductwork?

18  A    Yes.

19  Q    Could you please describe your observations of the

20  mechanical ducts?

21  A    So the photograph you had earlier of the mechanical

22  penthouse, you can see it with -- yes, that one.  So if you

23  notice there that vent, it -- there's a lot of microbial growth

24  inside of the mechanical penthouse.  We saw it on the ceiling

25  tiles.  We saw it on the walls.  We saw it on the floors.  And

Rodriguez - Direct / By Ms. Ndege                    14

1    as you can see, a lot of it is being shot out of the vent of

2    the mechanical ductwork.

3            We also saw that on the eighth floor just outside of

4    some vents as well where there's slight staining of some of

5    that microbial growth.  We weren't able to test exactly what

6    that was --

7    Q    Okay.

8    A    -- but because that growth is microscopic, it gets into

9    the vent system.  It gets into the duct system and it -- it's

10   likely to just penetrate the entire system.

11   Q    Why didn't you test the ducts?

12   A    That would -- I would have had to subcontracted that out.

13   That would have been beyond my personal expertise and just --

14   here were time constraints that I wouldn't have been able to do

15   that.

16   Q    All right.  And what is your recommendation in the interim

17   when it comes to the mechanical ducts, your repair

18   recommendations?

19   A    Because of just how difficult it is and because of the

20   extent of the microbial growth that was being shot out,

21   especially at the mechanical penthouse, my recommendation was

22   just to replace the entire vent system.

23   Q    Did the hurricane have any bearing on what you observed

24   with the mechanical ducts?

25   A    No, that would not have any bearing.

Rodriguez - Direct / By Ms. Ndege                    15

1   Q    Did the hurricane have any bearing on your opinion in

2   regards to the necessary repairs for the drop ceiling and the

3   mechanical ducts?

4   A    It did not.

5   Q    Did you calculate an estimate for the mechanical ducts?

6   A    I did.

7   Q    What number did you estimate?

8   A    That was $65,616.

9   Q    And how did you derive this figure?

10  A    That was also derived through RSMeans.

11  Q    All right.  So the next item on your list are the

12  chillers?

13  A    Yes.

14  Q    Did you inspect the chillers?

15  A    I did not inspect the chillers.

16  Q    What repairs are needed for the chillers?

17  A    So I was given some documentation, some email

18  correspondence and some quotes of a --

19  Q    Okay.

20  A    -- manufacturer --

21  Q    Okay.

22  A    -- that was performing some maintenance on the chillers

23  before I ever was retained on this matter or before I ever got

24  out to the project site.  It was just my recommendation that

25  the maintenance that had started just be completed.

Rodriguez - Direct / By Ms. Ndege                              16

1   Q    Okay.  And based on your review of those estimates, what

2   amount did you include for repairs to the chillers?

3   A    That total is $43,648.

4   Q    The next few items in your list involve the parking

5   garage.  Is this component of the repairs the one that requires

6   the most expensive repairs?

7   A    Yes, it is.

8   Q    Your report noted three safety concerns.  The first safety

9   concern involved the P1 level of the parking garage.  Can you

10  please describe the safety concerns there?

11  A    Yeah, at the P1 level, there was a significant settling of

12  the concrete slab, a very major break in the concrete.  And so

13  the concrete had settled.

14  Q    Okay.

15  A    Based on the extent of the settlement, my concern was that

16  if a heavy vehicle came and parked there that I don't -- it

17  wasn't clear exactly how stable that would be.  And so further

18  settlement could happen and it could have been fairly deep,

19  almost like a sinkhole, if you will, which my concern it would

20  actually lead to property damage to a vehicle or further damage

21  to the parking structure.

22  Q    And what do you believe caused this issue?

23  A    Based on everything I've seen -- I haven't seen any

24  drawings.  So I can't be with a hundred percent certainty but

25  based on my inspection and based on my experience in designing

1  these types of structures, it's my belief that the slab at the

2  P1 is grade supported which means it's just resting on soil.

3       And so the failure that I saw is indicative of a soil

4  failure where there's no longer support for the concrete slab

5  and so the concrete slab is not capable of carrying its own

6  weight and spanning the void that has occurred beneath it.  And

7  so that's caused the break.

8  Q    What is needed to fix this problem?

9  A    So to fix that problem, my recommendation was to perform a

10  saw cut of the concrete and to remove a section of the fatal

11  concrete.

12       **MR. TAYLOR:**  Your Honor, there's one of our witnesses

13  who (indisc.).

14       **THE COURT:**  Yeah.  Nobody has invoked the Rule.  So,

15  yeah.

16  **BY MS. NDEGE:**

17  Q    All right.  Go ahead.

18  A    Yeah.  So my recommendation was to remove a certain

19  portion of the failed concrete slab and then also would be to

20  remove and replace the failed soil and replace it with what we

21  call "select fill."  And that provides the proper structural

22  support for the slab on grade.

23  Q    Did you calculate an estimate?

24  A    I did.

25  Q    And what number did you estimate for the P1 level of the

Rodriguez - Direct / By Ms. Ndege                    18

1   parking garage?

2   A    So the parking structure Level P1, that's the $225,205.20

3   total.

4   Q    And how did you derive that amount?

5   A    That was also used -- derived using RSMeans as well.

6   Q    And did the hurricane have any bearings on what you

7   observed in the P1 level of the parking garage?

8   A    None.

9   Q    Did it have any bearing on your opinion in regards to

10  necessary repairs for this portion?

11  A    It did not.

12  Q    So the second safety concern you cited was the P7 level of

13  the parking garage.  Can you please describe the safety

14  concerns there?

15  A    So the safety concern that I had at P7, there's a -- along

16  the exterior edge of the parking garage, there's a cable

17  barrier system --

18  Q    Okay.

19  A    -- and that's what prevents a vehicle from driving over

20  the edge.  One of the cables has snapped and it lost tension.

21  And so the full cable barrier system is not present over -- I

22  don't remember specifically -- maybe three or four parking

23  spots it affects.  And so my recommendation was just to close

24  off those parking spots until that cable could be repaired.

25  Q    And what do you believe caused this cable to snap?

Rodriguez - Direct / By Ms. Ndege                    19

1   A    There's many things.  Sometimes they just lose the tension

2   or they lose their anchorage.

3          MR. TAYLOR:  Objection, calls for speculation.  The

4   question was, what do you believe caused this and he -- and

5   he's going into things that could cause it --

6          MS. NDEGE:  I'll withdraw the --

7          MR. TAYLOR:  -- testimony on what caused it.

8          MS. NDEGE:  I'll withdraw the question, Your Honor.

9          THE COURT:  Okay.

10  BY MS. NDEGE:

11  Q    During your observations, were there any indications

12  regarding what caused the cable to snap?

13  A    There weren't because all of the other cables were in

14  place and they seemed perfectly functional and they were

15  tensioned properly.  So it's just a case of one cable that just

16  failed.

17  Q    All right.  And did you calculate an estimate to repair

18  the cable or to repair and replace the cable?

19  A    I did.

20  Q    What is the number that you estimated?

21  A    That one was $954.

22  Q    And how did you derive that amount?

23  A    That was also used -- derived using RSMeans as well.

24  Q    Did the hurricane have any bearings on what you observed

25  regarding this cable?

Rodriguez - Direct / By Ms. Ndege                          20

1   A     It did not.

2   Q     Did it have any bearings on your opinion regarding the

3   necessary repairs for the cable?

4   A     It did not.

5   Q     The final safety concern that you cited that involved

6   water intrusion and potential mold issues, can you please

7   describe the mold and water intrusion issues?

8   A     Yes.  So, obviously, being there just a few days after the

9   hurricane and with the building's close proximity to the

10  Buffalo Bayou, the office building did receive water into the

11  interior.  And when we walked the first floor, again, this was

12  three days after.  There was still quite a bit of standing

13  water.  The carpets were still saturated with water.  There was

14  dirt and debris from the bayou.

15        And my concern was that after three days being in the

16  first floor, there was no conditioned air moving through the

17  space.  I didn't observe one single fan that was trying to dry

18  out the area.  I didn't see anybody actively mopping or

19  sweeping or trying to clean it up.  So my concern at that point

20  was just that if it's left untreated for a significant amount

21  of time, that could create another mold -- it could create mold

22  issues in the first floor.

23  Q     Okay.  So the hurricane had bearing on this part of your

24  observation?

25  A     Yes.  That was totally due to the hurricane.

Rodriguez - Direct / By Ms. Ndege                    21

1   Q    And did you recommend any repairs for this mold and water

2   intrusion issue?

3   A    I did not.  I just made note that it's a potential source

4   for additional problems down the road if not effectively

5   treated in a timely manner.

6   Q    Thank you.  The next item on your estimate was the sealed

7   bar joists.  Can you please describe your observations of the

8   steel bar joists?

9   A    Yes.  So in that photograph that just (indisc.), you can

10  see there up on the ceiling of the parking structure.  The

11  concrete deck is supported by these steel bar joists.  And the

12  bar joists are those open-web beams, if you will, where there's

13  a -- there's two angles on the top cord and to angles on the

14  bottom cord and then you've got those triangular bars in the

15  middle.

16       So those carry the parking garage, the parking deck.

17  Obviously, those are exposed to the elements.  They're exposed

18  to air.  They're exposed to weather.  So they have to be

19  painted to protect them from corrosion.

20  Q    Okay.

21  A    And what I noticed is that the bar joists are starting to

22  -- the paint on them is starting to crack and the reason for

23  that is because the bar joists are relatively light and that's

24  what makes them attractive to use is because they're light and

25  inexpensive.  But because they're so light, they deflect a lot.

Rodriguez - Direct / By Ms. Ndege                        22

1   And when they deflect under the load of the car, the paint is

2   not able to deflect with them and so the paint begins to crack

3   and it starts to fall away.

4           And when the paint is removed from the bar joists,

5   now that bare steel is left exposed to the elements.  It can

6   rust.  And it's just a snowball effect at that point where the

7   rust starts to break away the steel -- or take away the paint.

8   I'm sorry.  And once that begins to rust, you start to lose

9   cross section and corrosion of the steel.

10  Q    Was this consistent with every floor of the parking

11  garage?

12  A    Yes.  The loss of paint and the cracking of the paint was

13  consistent across all -- all the bar joists.

14  Q    Given that, do you recommend that certain bar joists are

15  replaced or all bar joists?  What's your recommendation

16  regarding that?

17  A    So my recommendation was not to replace the bar joists.

18  There are some bar joists where there's some significant

19  corrosion that's occurring at the seat.  And my concern that if

20  the paint if not restored that the corrosion will just get

21  worse and then that could result in the structural integrity of

22  the bar joists.  So my recommendation is to restore the paint

23  finish to the bar joists so that they are protected from

24  further corrosion.

25  Q    Did you calculate an estimate for restoring the paint?

Rodriguez - Direct / By Ms. Ndege                    23

1   A    I did.

2   Q    And what's the number that you estimated?

3   A    So that was the most costly item of the entire repair

4   estimate and that one line item is -- was estimated at 2.8

5   million.

6   Q    And how did -- sorry.  How did you derive that amount?

7   A    That was also derived using RSMeans.

8   Q    And did the hurricane have any bearing on what you

9   observed with the steel bar joists?

10  A    It did not.

11  Q    Did it have any bearing on your opinion in regards to the

12  necessary repairs of the bar joists?

13  A    It did not.

14  Q    The next item on your list was the ramp between the P1

15  parking level and the P2 parking level.  Would you please your

16  describe your observations of this ramp?

17  A    Yes.  So at the ramp -- so when enter the parking garage,

18  it's my understanding you enter at Parking 2 from the street

19  level and then there's a ramp that takes you down to the P1

20  level.  Again, from what I could tell based on my observations

21  without having the benefit of the drawings to understand

22  exactly how it was constructed, the portion of the ramp that I

23  observed appeared to be supported on grade just as the issue

24  that we talked about earlier at P1.  And that has also settled

25  as well --

Rodriguez - Direct / By Ms. Ndege                    24

1  Q    Okay.

2  A    -- not to the extent that it has settled at P1 but,

3  nonetheless, it has settled and there's a significant

4  depression that's observable.

5  Q    Did you -- what's your recommendation for repairing?

6  A    My recommendation would be to do the same thing, would be

7  to remove that concrete and remove the soils and replace them

8  with suitable soil so that the -- it doesn't worsen.

9  Q    Did you calculate an amount for these repairs?

10 A    I did.

11 Q    And what was the number you estimated?

12 A    That repair was estimated at $17,525.

13 Q    How did you derive that amount?

14 A    We used RSMeans to do that.

15 Q    And did the hurricane have any bearings on what you

16 observed on this ramp?

17 A    It did not.

18 Q    Did it have any bearings on your opinion in regards to the

19 repair?

20 A    It did not.

21 Q    All right.  So the next item was the P2 level and the P4

22 level of the parking garage.  Can you please describe your

23 observations of the P2 and P4 parking level?

24 A    Yes.  So in discrete areas that we noticed on the P2 level

25 and the P4 level, we noticed discrete areas of spalling.  And

1   what "spalling" is, it's breaking away of the concrete.  Now,

2   concrete is reinforced with steel reinforcement and when you

3   have spalling in concrete, the concern is that moisture can now

4   get inside the concrete and so there you can see the breaking

5   of the concrete and you can see the structural -- the steel

6   reinforcement is exposed.

7           Similar to the bar joists, now that steel

8   reinforcement that's usually encased within the concrete is now

9   exposed to the elements.  It can take on moisture and it can

10  rust and when steel reinforcement rusts, it breaks the bond

11  between itself and the concrete and when that bond is broken,

12  the concrete starts to fail even further and it starts to

13  crumble away.

14          And so my concern is that this type of instance where

15  the reinforcement is exposed, if it's not addressed and patched

16  up, you'll have another instance where you could have a hole in

17  the parking slab form as there has already been on previously.

18  Q   So is there a recommendation for repair patching up the

19  hole?

20  A   So my recommendation would be to just remove a very small

21  discrete area where the spalling has occurred and then patch

22  that up.

23  Q   And what -- how -- did you calculate an estimate for that

24  repair?

25  A   I did.

Rodriguez - Direct / By Ms. Ndege                          26

1   Q    And what number did you estimate for that?

2   A    So we came up with two numbers for that, I believe.  So

3   the number at the P2 elevated slab at three discrete areas, we

4   estimated that repair at $25,720.  And then on the P4 level,

5   also three discrete areas which were slightly larger, that came

6   out to $87,004.

7   Q    Did you use RSMeans to derive these figures?

8   A    We did use RSMeans, yes.

9   Q    And did the hurricane have any bearing on what you

10  observed for the P2 level and P4 level of the parking garage?

11  A    It did not.

12  Q    Did it have any bearings on your opinion regarding the

13  repairs of these two -- this item?

14  A    It did not.

15  Q    Now, the final were the wheel stops.  Could you please

16  describe your observations of the wheel stop?

17  A    The wheel stops just were -- some of them were starting to

18  crack.  Some of them were starring to break.  There were a few

19  that were missing.  You could tell some of them had been

20  dislodged and had moved.  And so they just needed to be

21  restored.

22  Q    Restored.  And did you calculate an estimate for restoring

23  them?

24  A    Yes.

25  Q    What is the number that you estimated?

Rodriguez - Direct / By Ms. Ndege                    27

1  A    The wheel stops came to $11,037.

2  Q    And did you use RSMeans to derive that amount?

3  A    We did, yes.

4  Q    And did the hurricane have any bearing on what you

5  observed with the wheel stops?

6  A    It did not.

7  Q    Did it have any bearing in regards to the repairs that you

8  thought were necessary for the wheel stops?

9  A    It did not.

10 Q    Did you calculate a total amount for all of the repairs

11 that you recommended?

12 A    Yes.  The total came out to -- after -- so the numbers

13 that we just talked about where I gave you the specific repair

14 costs, those are what we would call "hard costs" --

15 Q    Okay.

16 A    -- the cost to do the specific work tasks.  And then we

17 added in what we call "soft costs" and what we then added there

18 is a 15-percent multiplier for general conditions.

19      So if you undertake this entire project, the approach

20 would most likely be to hire a general contractor that would

21 sub-out the specific trades that need to do each work.  So the

22 company that does the repair to the concrete slab is not going

23 to do the repair to the roof, is not going to do the repair to

24 the cable barrier system.

25      So you'll have a general contractor and they'll have

1  general conditions to manage and supervise the project and a

2  typical amount, that is 15,000 -- 15 percent of the hard costs.

3  And so then from there, we added a contingency to account for

4  any kind of unknowns that might be encountered during the

5  execution of the project.  And that contingency was 20 percent.

6  Q    Did you account for insurance or did you include

7  insurance?

8  A    We included a 1.2 -- 1.25 -- excuse me one and a quarter

9  percent multiplier for insurance.  That's just the typical

10  insurance that you would need to have on a construction

11  project.  We also added in a 10 percent multiplier for the

12  contractor's fee or his profit, and then an eight percent

13  multiplier for professional fees.  Again, for a project like

14  this, you'll need to get signed and sealed engineering

15  drawings, possibly architectural drawings and so you'll need to

16  hire a licensed designer and their fees would be approximately

17  eight percent of what the hard costs are.

18  Q    And I don't know if we discussed this but did you include

19  an amount for general concrete work?

20  A    Yes.  So obviously with all the concrete work, with the

21  demolition of the concrete that I'm recommending, there'll be

22  things like cleanup and disposal and so we included a line item

23  for that as well.

24  Q    So I'm going to pull up an invoice for garage repairs by

25  Olshan.  It's debtor's Exhibit 32.

Rodriguez - Direct / By Ms. Ndege                          29

1          Are you familiar with this invoice?

2   A    I am.

3   Q    Does it address any of your concerns regarding the

4   condition of the parking garage?

5   A    So from what I could tell this invoice is in response to

6   the issue that I identified at the P1 level where the concrete

7   slab has settled.

8   Q    Okay.  So does it address what you recommended as a

9   repair?

10  A    It's an option but in my opinion it's not necessarily a

11  permanent option because what happens here is the methodology

12  is they inject a material into the ground and what it does is

13  it fills up the void and then it also, once the void is filled,

14  they continue to fill it and under pressure it lifts the slab.

15          Now, what happens when you lift the slab, as you can

16  tell, in this paragraph, there's still a significant break in

17  that slab and so you still need to reestablish the continuity

18  of the concrete there because at that point with still a break,

19  you still have a way for moisture to get through that slab and

20  get down into the underlying silos as well which can still

21  continue to just deteriorate and wash away.

22          And so because of the fact that this is outdoors,

23  because it's of its proximity to the Buffalo Bayou with just a

24  few feet above the typical water level, I don't really consider

25  this a permanent option.

```
                    Rodriguez - Cross / By Mr. Taylor                30
```

1   Q    Given all those factors as a construction engineer, would

2   you recommend this repair?

3   A    Not -- not to reestablish the -- you know, a permanent fix

4   for the slab.

5            MS. NDEGE:  Thank you.  I'll pass the witness, Your

6   Honor.

7                         **CROSS EXAMINATION**

8   **BY MR. TAYLOR:**

9   Q    Good afternoon, Mr. Rodriguez.

10  A    Hello, Mr. Taylor.

11           **MR. TAYLOR:**  Your Honor, first of all, I want to move

12  for admission of the exhibit that they just referenced that he

13  just testified to, Debtor's Exhibit 32.

14           **THE COURT:**  All right.  Any objection to Debtor's

15  Exhibit 32?

16           **MS. NDEGE:**  No objection, Your Honor.

17           **THE COURT:**  All right.  Debtor's Exhibit 32 is

18  admitted.

19      **(Debtor's Exhibit Number 32 received in evidence)**

20  **BY MR. TAYLOR:**

21  Q    Mr. Rodriguez, we'll start with there.  You're familiar

22  with Olshan Foundation Repair, aren't you?

23  A    I am, yes.

24  Q    And they're a qualified concrete repair service in Houston

25  and elsewhere?

Rodriguez - Cross / By Mr. Taylor                          31

1   A    Yes.

2   Q    What you I think told the court, if I synthesize it, is

3   they recommended using this to repair the P1 problems.  You

4   disagree and prefer your method better; is that right?

5   A    Yes.

6   Q    When you tallied up the total cost of repair, it was about

7   5.9 million dollars but if you take out the GNA and the

8   insurance and everything else that you said a general

9   contractor would charge, the total cost of repairs was about

10  3.7 million, correct?

11  A    That's correct.

12  Q    About 2.2 million dollars in the what I'll call "overhead

13  costs" that you've attributed for work by a general contractor

14  on the project, correct?

15  A    Yes.

16  Q    There's no reason that an owner of a building couldn't do

17  the contracting themselves, is there, and go and hire

18  contractors to do individual projects, right?

19  A    Sure.  The owner could self-contract, could self-manage

20  it.

21  Q    And they would save the 2.2 million dollars, right?

22  A    It would save -- yeah, with the exception there's a

23  contingency line item in there and I would always recommend

24  that that contingency fund be in there just to fund any kind of

25  surprises that might occur.

Rodriguez - Cross / By Mr. Taylor                    32

1   Q    But you don't know whether a surprise would occur or not,

2   do you?

3   A    No.

4   Q    That's why it's called a "contingency," right?

5   A    Absolutely.

6   Q    Now your work, the company you work for now, Secretariat

7   (phonetic), how long have you worked there?  Remind me.

8   A    I began there in January of this year.

9   Q    And 100 percent of your practice is expert witness work

10  with them, correct?

11  A    Well the -- 100 percent of our practice of my practice is

12  advising on projects that are involved in some kind of

13  litigation or arbitration.  I don't always testify as an expert

14  witness on all the projects I work on.

15  Q    Fair enough.  Expert analysis and witness work relating to

16  litigation.

17  A    Yeah.  Forensic engineering as well, we refer to it as.

18  Q    And at your prior employer, about 75 percent of your

19  practice was that same type of work, correct?

20  A    That's probably right, yes.

21  Q    And in your career you've only done engineering analysis

22  on three commercial high-rise buildings, correct?

23  A    As a design engineer, yes.

24  Q    And one of those was in Houston, right?

25  A    Yes.

Rodriguez - Cross / By Mr. Taylor                          33

1   Q    Now you said you did the inspection on 7/12.  I looked

2   back at your report it was actually on 7/11, wasn't it?  July

3   11th?

4   A    I might have misspoke.  I apologize for that.

5   Q    So that would have been three days after Hurricane Beryl

6   hit?

7   A    Yeah.  It was definitely three days after Hurricane Beryl

8   hit.  I remember that.  The specific day I probably misspoke.

9   Q    I know you repeatedly said -- and I'll give you the wheel

10  stops and the cable break -- but I notice that you said that

11  the hurricane had no bearing on every one of your analyses you

12  did on the repairs, correct?

13  A    That's correct.

14  Q    You didn't see the property before the hurricane, did you?

15  A    No.  I was scheduled to go see the property before the

16  hurricane but it was not able to happen so the only time I saw

17  it was -- was on that day.

18  Q    So you did not see the property before the hurricane hit,

19  did you?

20  A    No, I did not.

21  Q    So you don't know what the conditions looked like before

22  the hurricane was there, do you?

23  A    No, because I hadn't observed it.

24  Q    In your inspection, you actually only looked at two -- you

25  went to the roof, right?

Rodriguez - Cross / By Mr. Taylor                    34

1   A    I went to the roof, correct.

2   Q    And you went through the parking garage, correct?

3   A    I did.

4   Q    And then you looked at two floors inside the eight floor

5   building, didn't you?

6   A    That's correct.  Actually three, I'm sorry, I looked at.

7   Q    Well, including some of the first floor, right?

8   A    The first floor, the eighth floor, and then actually we

9   did go -- we did go onto the sixth floor to observe there was a

10  glass curtain wall in the southeast corner of the building that

11  I think had sustained hurricane damage and it had blown out.

12  And so the gentleman who was escorting around -- escorting us

13  around showed us that so we did see the sixth floor as well.

14  Q    I want to talk about some of the problems that you've

15  mentioned of what you believe were issues and let's talk first

16  of all about the joists.  That was the largest single item on

17  the repair, wasn't it?

18  A    It was.

19  Q    That was a number -- I want to make sure I get the number

20  right.  2.8 million or the three point -- 2.8 million or the

21  3.9 million -- or 3.7 million, correct?

22  A    Correct.

23  Q    Now you didn't actually measure the joist in the parking

24  garage, did you?

25  A    We did.  We measured the -- I mean we took -- we took a

Rodriguez - Cross / By Mr. Taylor                    35

1   measurement of how long the joists were and then we just --

2   Q    Extrapolated that?

3   A    -- extrapolated it out to get a total quantity.

4   Q    And there were no signs that the steel was failing,

5   correct?

6   A    No sign that the steel was failing, no.  There were signs

7   of corrosion but no impending failure in my opinion.

8   Q    And you can't say when the steel would fail, if ever, can

9   you?  Couldn't give a date.

10  A    I mean I can't tell you that it'll fail on May 5th of 2027

11  but if it's left untreated it's my opinion that a failure will

12  eventually happen.

13  Q    But you can't say when.

14  A    I can't say when, no.

15  Q    And you didn't go actually get -- I think you testified --

16  a quote from any contractor for that work, did you?

17  A    We did not.

18  Q    In fact, you didn't get a bid from a contractor for any of

19  this work, did you?

20  A    With the exception of the chiller work which had already

21  been -- which had already been prepared.

22  Q    And that was $43,648, correct?

23  A    Yes, sir.

24  Q    So the 3.7 million dollars before you get the other costs,

25  the only one that you actually have a bid on is for $43,648,

Rodriguez - Cross / By Mr. Taylor                    36

1   correct?

2   A    That's correct.

3   Q    The garage itself is safe, isn't it?

4   A    Yeah, I believe it's safe other than -- again, other than

5   the two issues I raised that I thought should be addressed.

6   Q    So the wheel -- wheel stops, correct?

7   A    Yes, the wheel stops --

8   Q    That's one of them?

9   A    -- yes.

10  Q    And the costs for to fix the wheel stops --

11  A    Well the wheel stop wasn't what I was considering as a

12  safety issue.  It was the cable barrier.

13  Q    Well you said there were two and so I thought maybe that

14  was one of the other ones.

15       Cable barrier is on P7 and that's $954 to repair?

16  A    That's correct, yes.

17  Q    And what was the other safety?

18  A    Well the other one I was concerned about was the settled

19  slab on P1.  Again, if a car, a heavy pickup truck were to park

20  there I'd be concerned that there's a possibility of that.

21  Q    Did you do any load testing on it?

22  A    I did not do any load testing.

23  Q    You do any failure analysis on it?

24  A    Did not do any calculations.  I wouldn't have the

25  information to do that.

Rodriguez - Cross / By Mr. Taylor                    37

1   Q    And you can't say that the garage was not properly

2   constructed, can you?

3   A    No.  I didn't see any signs of improper construction.

4   Q    Aren't -- I know you said you hadn't been there prior to

5   Hurricane Beryl, so you don't know if that structure at P1 had

6   ever flooded before, do you?

7   A    If the structure at P1 had flooded?

8   Q    Yes.

9   A    I mean other than Hurricane Harvey, I'm not aware of any

10  other flooding.  I couldn't tell you whether or not with any

11  specificity that it has.

12  Q    Well you didn't go inspect this property in connection

13  with Hurricane Harvey, did you?

14  A    I did not, no.

15  Q    You also testified that area appeared to be grade

16  supported.  You don't know whether this garage is grade

17  supported or not, do you?

18  A    No, I haven't reviewed any drawings.  Again I'm just

19  basing that on my experience of how it presents.

20  Q    Now you said you observed the ponding on the roof and we

21  saw the pictures of that.  Again, you didn't observe that

22  before the hurricane, did you?

23  A    I did not.

24  Q    So you don't know how much of that ponding was due to the

25  hurricane, do you?

Rodriguez - Cross / By Mr. Taylor                    38

1  A    I couldn't imagine that any of it was due to the

2  hurricane.

3  Q    You don't know what was done as a result of the hurricane

4  and what wasn't, do you?

5  A    Well I may mis -- not understand your question but my --

6  to answer it to the best I can is that the ponding is something

7  that occurs slowly over time.

8  Q    Had you ever observed ponding up there before you went up

9  on the 11th?

10  A    I have never been up there before that day.

11  Q    So you don't know how much ponding occurs up there on a

12  normal rain storm, do you?

13  A    I do not know that, no.

14  Q    You also don't know if the roof is being replaced by

15  insurance, do you?

16  A    I do not know that, no.

17  Q    In fact, you did not do any assessment of whether any of

18  these conditions would be covered by insurance, did you?

19  A    No, I did not.

20  Q    I know there was some discussion in your deposition about

21  what a roof square is.  Did you ever go back and look up what a

22  roof score is after your deposition?

23  A    I did, yeah.

24  Q    And you understand that a roof square is different than a

25  square foot measurement for the roof, isn't it?

Rodriguez - Cross / By Mr. Taylor                    39

1  A    A roof square is a hundred square feet, yes, and it's a

2  terminology that is used in the industry.  And again, you can

3  price a roof based on roof squares or you can price it on

4  square foot.  And my experience throughout my career has always

5  been pricing it on a square-foot basis.

6  Q    But in fact, isn't it common in the industry to use roof

7  squares as the basis for us doing a roof repair cost; isn't

8  that right?

9  A    I don't know if I would agree with that.  I mean my

10 experience with roof squares is that it's on how they order

11 things like shingles.  I have advised several clients at our

12 roofing manufacturers and I'm currently working with two right

13 now and we always talk in terms of square footage.

14 Q    Now you talked about the HVAC or ducts.  Let's talk about

15 the ducts, the mechanical ducts.

16       Again, you only looked at the ducts on two floors;

17 isn't that right?

18 A    Well yeah on eight, six and two.  We did look at six while

19 we were there but we didn't observe any -- any of the issue

20 that we saw on eight.

21 Q    And you didn't do any inspection onsite any of the ducts,

22 did you?

23 A    Did not, no.

24 Q    Didn't run a camera up through there to take a look, did

25 you?

Rodriguez - Cross / By Mr. Taylor                40

1  A    No, I did not.

2  Q    And you didn't do any testing of any of the microbial

3  growth that you saw, did you?

4  A    No.  I wouldn't be qualified to do that kind of testing.

5  Q    Well you could have had somebody do it, right?

6  A    We could have somebody do it.  And like I said earlier, I

7  would have liked to have done it.  There just were time

8  constraints that did not allow for that.

9  Q    So you didn't take -- you don't know anything about the

10 condition of the inside of the ducts, do you?

11 A    No.

12 Q    And you didn't do any mold testing, correct?

13 A    That's correct.

14 Q    The water issues, you talked about the dropped ceiling

15 issues on the eight floor in the mechanical penthouse.  Do you

16 recall that?

17 A    Yes, sir.

18 Q    And the eighth floor is the top level of the building,

19 correct?

20 A    Yes.

21 Q    And the mechanical penthouse would be on top of the

22 building?

23 A    Yeah, I believe you access it through the top of the

24 through like through the roof.  It's up there.

25 Q    So the eighth floor and the mechanical penthouse would

Rodriguez - Cross / By Mr. Taylor                          41

1   have been the two areas that would have been closest to where

2   the rain was coming in from a hurricane, for lack of a better

3   term, correct?

4   A    Yeah.  That's why those are the areas that are that

5   exhibit water damage.

6   Q    And so you don't know what they would look like or the

7   condition of those were before the hurricane, do you?

8   A    I do not.

9   Q    Going back briefly to this issue of the Olshan, you

10  actually are familiar with the product they use, aren't you?

11  A    I am, yes, sir.

12  Q    And you've actually gotten quotes from them and specked

13  out that type of work before, haven't you?

14  A    I had a project one time where we it was our

15  recommendation to use that, that methodology to restore some

16  concrete.

17  Q    And they are a respected contractor, aren't they?

18  A    I have no reason to believe otherwise.

19  Q    Well actually in your testimony you said they are a

20  respected contractor.  Do you change your testimony today?

21  A    No, I do not, no.

22  Q    And you believe they do quality work, right?

23  A    I've never seen their work but again I've never heard of

24  anything that their work is bad.

25           **MR. TAYLOR:**  Thank you.  Pass the witness, your

1   Honor.

2          **THE COURT:**  Redirect?

3                      **REDIRECT EXAMINATION**

4   **BY MS. NDEGE:**

5   Q    Mr. Rodriguez, can you please explain why you prefer your

6   method over Olshan again?

7   A    Yeah.  Again my -- the reason that I selected the method

8   that I did is because I think that provides a more permanent

9   solution and something that's not going to be subjected to

10  further washing away in the future.

11  Q    And if you didn't see the property before the hurricane,

12  how can you say that has no bearing on the repairs that you

13  recommended and the condition of the property?

14  A    Because the conditions that I saw that I have opined on

15  are issues that as an engineer who's been practicing for nearly

16  25 years and have done forensic investigations on these type of

17  projects, the issues that I've seen are not issues that happen

18  in the span of 72 hours because of a hurricane.  They're issues

19  that happen over prolonged periods of time due to the property

20  not being properly maintained.

21  Q    And did your report include a maintenance program for the

22  property?

23  A    It did.  I attached a -- to my report I --

24         **MR. TAYLOR:**  Objection.  Your Honor, the report is

25  not in evidence.  (inaudible) talk about (inaudible) not talk

Rodriguez - Redirect / By Ms. Ndege                    43

1   about his maintenance of (inaudible) for the property.  That

2   report is not in evidence.

3           **MS. NDEGE:**  I'll withdraw the question, Your Honor.

4           **THE COURT:**  Okay.  She's withdrawn the question.

5   **BY MS. NDEGE:**

6   Q    Do you have any recommendation regarding maintenance for

7   the property?

8   A    I absolutely do, yes.  Because the parking structure --

9   and that's where --

10          **MR. TAYLOR:**  I'm going to object, Your Honor.  This

11  goes beyond the scope as well.  I didn't ask anything about a

12  maintenance program for the property.  She (inaudible) have

13  done this on Direct.

14          **THE COURT:**  How does it relate to the scope of Cross,

15  Ms. Ndege?

16          **MS. NDEGE:**  It relates to the scope because I think

17  there's an argument that these repairs are based on the

18  hurricane, rather, or that there's -- there are questions

19  regarding hurricane damage as opposed to a lack of maintenance.

20          **THE COURT:**  Right.  And you addressed it on your

21  Direct and Mr. Taylor had an opportunity to ask about it on

22  Cross.  He didn't open the door to any new issues.  I think you

23  had your chance.  We're not going to rehash that.

24          **MS. NDEGE:**  Thank you, Your Honor.

25          **THE COURT:**  The objection is sustained.

Rodriguez - Recross / By Mr. Taylor                    44

1    **BY MS. NDEGE:**

2    Q    And is the Olshan estimates, were they only proposed for a

3    certain part of the parking garage?

4    A    Yeah.  My understanding it's just on the P1 level, yes.

5         **MS. NDEGE:**  All right.  Thank you.  I pass the

6    witness.

7         **MR. TAYLOR:**  (inaudible).

8         **THE COURT:**  Limited to the scope of the Redirect?

9         **MR. TAYLOR:**  It is.

10                      **RECROSS EXAMINATION**

11   **BY MR. TAYLOR:**

12   Q    Mr. Rodriguez, you said that you preferred your method

13   over Oshan's because it guarded against further washing away.

14   Again, you don't know how often this parking garage has flooded

15   in the past, do you?

16   A    I'm sorry, I didn't hear that last part.

17   Q    You don't know how often this parking garage has flooded

18   in the past, do you?

19   A    I can't tell you how many times it's flooded over its

20   life.

21   Q    And do you consider the report you did in this a forensic

22   investigation?

23   A    I do.

24   Q    Like that's what you called it in the Redirect that you

25   had with Ms. Ndege, didn't you?

Rodriguez - Recross / By Mr. Taylor                    45

1   A    I said the word "forensic".  I can't remember exactly how

2   I used it.  Sorry.  Bad short-term memory.

3   Q    But in this case, again, you didn't go in and take a look

4   inside ducts, correct?

5   A    I did not.

6   Q    You didn't perform failure analysis, did you?

7   A    Again, I did not.

8          **MR. TAYLOR:**  Thank you.  Pass the witness.

9          **MS. NDEGE:**  Objection, Your Honor.

10         **THE COURT:**  Overruled.  We're good?  Anymore?

11         **MS. NDEGE:**  No further questions, Your Honor.

12         **THE COURT:**  All right.  Witness can be excused.

13      **(Requested transcription concluded at 5:18 p.m.;**

14   **proceeding continued)**

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____              **August 23, 2024**

   **Signed**                              **Dated**

*TONI HUDSON, TRANSCRIBER*